**SO ORDERED.**

**SIGNED this 23 day of January, 2008.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

**IN RE:**

| | |
|---|---|
| PARTITIONS PLUS OF WILMINGTON, INC., D/B/A PARTITIONS, INC., D/B/A STORM PROTECTION SYSTEMS, | Case No. 04-06776-8-JRL Chapter 7 |
| **Debtor.** | |
| JAMES B. ANGELL, CHAPTER 7 TRUSTEE FOR PARTITIONS PLUS OF WILMINGTON, INC., D/B/A PARTITIONS, INC., D/B/A STORM PROTECTION SYSTEMS, | Adversary Proceeding No. 06-00157-8-AP |
| **Plaintiff,** | |
| v. | |
| NEFF RENTALS, INC., | |
| **Defendant.** | |

_____

## ORDER

This case is before the court on cross-motions for summary judgment filed by the defendant, Neff Rentals, Inc. ("defendant"), and the chapter 7 trustee, as well as the trustee's motion to strike two affidavits of Lauri M. Fountain, an employee of the defendant. On January 15, 2008, the court conducted a hearing on these matters in Raleigh, North Carolina.

**JURISDICTION AND PROCEDURE**

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine.

**FACTS AND BACKGROUND**

Partitions Plus of Wilmington, Inc. ("debtor") filed a chapter 11 bankruptcy petition on September 1, 2004.[1] The case was converted to one under chapter 7 on November 9, 2004. Prior to the bankruptcy filing, the debtor transmitted five checks to the defendant totaling $23,077.50 for leased construction equipment and related construction equipment repair. On July 17, 2006, the trustee filed this adversary proceeding seeking to avoid these payments under 11 U.S.C. § 547 and recover them pursuant to § 550(a).[2] Both parties filed motions for summary judgment, and the

---

[1] As an initial matter, the parties disagree whether this adversary proceeding is governed by the Bankruptcy Code as written prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, or whether the post-BAPCPA Bankruptcy Code applies. This disagreement arises because although the debtor filed for bankruptcy prior to BAPCPA's effective date, the trustee instituted this adversary proceeding after BAPCPA became effective.

The court finds that the pre-BAPCPA Bankruptcy Code governs this adversary proceeding. The language of BAPCPA states that "the amendments made by this Act shall not apply with respect to *cases* commenced under title 11, United States Code, before the effective date of this Act." Id. at § 1501(b)(1) (emphasis added). The statute makes clear that the filing date of a case, rather than an adversary proceeding or some other proceeding based on the underlying bankruptcy case, is the operative date for determining which law applies. Other bankruptcy courts have similarly decided this issue. See, e.g., In re Ammar, 368 B.R. 629, 631 n.2 (Bankr. E.D. Mich. 2007); In re Scheu, 356 B.R. 751, 752 n.1 (Bankr. D. Idaho 2006). Therefore all section references are to the Bankruptcy Code as it existed prior to BAPCPA.

[2] The trustee's initial complaint also asserted that the transfers constituted fraudulent transfers under § 548. However, the trustee has since abandoned this claim. Plaintiff's Memorandum in Support of His Response to Defendant's Motion for Summary Judgment at 10.

trustee also filed a motion to strike the affidavits of Lauri M. Fountain, an employee of the defendant, on the basis that they contain statements unsupported by fact and/or personal knowledge, as well as conclusory statements of law.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), made applicable in bankruptcy by Bankruptcy Rule 7056, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962).

## ANALYSIS

The trustee alleges that the following checks of the debtor constitute preferential transfers under 11 U.S.C. § 547(b): check number 4138 in the amount of $6,173.91, clearing the debtor's bank account on June 10, 2004; check number 4469 in the amount of $1,150.00, clearing the debtor's bank account on July 9, 2004; check number 4537 in the amount of $1,301.55, clearing the debtor's bank account on July 22, 2004; check number 4675 in the amount of $13,292.70, clearing the debtor's bank account on July 29, 2004; and check number 4737 in the amount of $1,159.34,

clearing the debtor's bank account on July 29, 2004.

## I. Prima Facie Case - Preference Payment

In order to avoid an alleged preference payment, the trustee must show that: (1) the defendant received an interest of the debtor in property; (2) the property received was to or for the benefit of the defendant as a creditor of the debtor; (3) the payment in question was for or on account of an antecedent debt owed by the debtor before such transfer was made; (4) the transfer was made while the debtor was insolvent; (5) the transfer was made within ninety days prior to the date of the filing of the petition; and (6) the transfer enabled the defendant to receive more than it would have if the case was filed under chapter 7, had the transfer not been made and the defendant paid its debt according to the Bankruptcy Code. 11 U.S.C. § 547(b). The trustee has the burden of proving each element. Id. at § 547(g).

The parties agree that: except for the July 2, 2004 transfer, each transfer was made to or for the benefit of the defendant as a creditor of the debtor; each transfer was for or on account of an antecedent debt owed by the debtor before the transfers were made; and each transfer was made within ninety days prior to the petition date. Therefore, the only contested elements are whether: the defendant received an interest of the debtor in property; the July 2, 2004 payment was made to or for the benefit of the defendant as a creditor of the debtor; each transfer was made while the debtor was insolvent; and the defendant received more than it would have received under a chapter 7 had the transfer not been made and the defendant paid its debt according to the Bankruptcy Code.

First, with respect to whether the defendant received an interest of the debtor in property, it is clear that the funds transferred would have been part of the debtor's bankruptcy estate had they not been transferred prior to the bankruptcy petition date. Second, the defendant conceded at the

4

January 15, 2008 hearing that the July 2, 2004 payment reimbursed the defendant for repair costs associated with construction equipment that the debtor damaged, and therefore, contractually obligated to pay pursuant to the lease. Based on this contractual obligation, the July 2, 2004 payment was made for or on account of an antecedent debt owed by the debtor to the defendant, and as a result, the payment was made to the defendant as a creditor of the debtor. Third, 11 U.S.C. § 547 presumes that the debtor is insolvent during the ninety days immediately preceding the petition date, and the defendant has presented no evidence to rebut this presumption. Finally, the defendant received more than it would have in a hypothetical chapter 7 case. That it may have received money from a solvent surety, guarantor or co-obligor is irrelevant. See Smith v. Creative Fin. Mgmt. (In re Virginia-Carolina Fin. Corp.), 954 F.2d 193, 199 (4th Cir. 1992). Therefore, the court finds that the trustee has established that the payments in question constitute preferences under § 547(b) as a matter of law.

## II. Affirmative Defenses

In its motion for summary judgment and response to the trustee's motion for summary judgment, the defendant raises two affirmative defenses under § 547(c) that were initially asserted in its answer.[3] First, the defendant argues that, under § 547(c)(4), it gave new value to the debtor during the preference period by continuing to provide construction equipment rental services. Second, the defendant contends that the transfers were in payment of a debt in the ordinary course of business under § 547(c)(2).

---

[3] The defendant also raises a third affirmative defense. However, analysis of this defense is unnecessary to the resolution of this case because, as discussed below, the new value defense and ordinary course of business defense resolve all issues.

5

A. New Value Defense

The Bankruptcy Code provides that the trustee may not avoid an otherwise avoidable preference transfer to the extent that the transfer was made

> to or for the benefit of the creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor not secured by an otherwise unavoidable security interest, and on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).  In <u>Crichton v. Wheeling Nat'l Bank (In re Meredith Manor)</u>, 902 F.2d 257 (4th Cir. 1990), the Fourth Circuit adopted the following approach to calculating new value:

> This method looks at the 90-day preference period and calculates the difference between the total preferences and the total advances, provided that each advance is used to offset only prior (although not necessarily immediately prior) preferences. . . . In other words, the creditor is allowed to apply the giving of "new value" against the immediately preceding preference as well as against all prior preferences.

<u>Id.</u> at 259.

The trustee's filings in this case concede that the defendant provided the debtor with new value, and that it is entitled to an offset in an undetermined amount.  At the January 15, 2008 hearing, the parties agreed that only $9,723.50[4] remains at issue as preference payments after the <u>Meredith Manor</u> analysis.  Therefore, the court finds that the defendant has established its new value defense as matter of law with respect to some of the preference payments, and that it is entitled to an offset in the amount of $13,354.00.

---

[4] The parties explicitly agreed that $9,498.50 remains after the offset.  The parties further agreed that if the court ruled that the July 2, 2004 payment in the amount of $1,150.00 constitutes a preference, then all but $225.00 of that payment would be offset as new value. Based on the court's finding that the July 2, 2004 payment is, in fact, a preference payment, the court applies $925.00 to the defendant's new value offset.

6

B. Ordinary Course of Business Defense

The defendant next argues that the trustee may not avoid the preference payments because they were received in the ordinary course of the defendant's business as a construction equipment rental company. Under § 547(c)(2), a trustee may not avoid a transfer:

> to the extent that such transfer was –
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). This inquiry is "peculiarly factual," Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 486 (4th Cir. 1992), and the recipient of a preferential transfer has the burden of proving, by a preponderance of the evidence, that the transfer was made in the ordinary court of the debtor's business. 11 U.S.C. § 547(g).

The test for whether a preference payment is made in the ordinary course of business consists of two-prongs.[5] Subsection B's subjective prong analyzes whether the terms of dealing used by the parties during the preference period deviated from terms of dealing before the preference period. Under subsection C, the court applies an objective approach by looking at whether the parties' preference-period dealings were consistent with industry standards.

Although read conjunctively, these two subsections do not always receive the same weight in the Fourth Circuit due to our circuit's "sliding scale" approach. See Advo-System, Inc. v.

---

[5]The plain language of the pre-BAPCPA statute requires a conjunctive reading of subsection B and subsection C. BAPCPA amended the statute by replacing what formerly was a conjunctive test with a disjunctive test. See, e.g., In re Nat'l Gas Distrib., LLC, 346 B.R. 394, 399-400 (Bankr. E.D.N.C. 2006). As discussed above, however, the pre-BAPCPA version of the Bankruptcy Code applies to this case, and the defendant must satisfy the conjunctive test.

Maxway Corp., 37 F.3d 1044, 1049-50 (4th Cir. 1994) (adopting the same approach developed in Fiber Lite Corp. v. Molded Acoustical Prods. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217, 224 (3d Cir. 1994)).  According to this approach, "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)."  Molded Acoustical, 18 F.3d at 225.  Conversely, "[w]hen the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry."  Id.

Based on the evidence presented, the court finds that the parties' pre-preference period business dealings were quite significant.  Far from a relationship of "recent origin," the defendant supplied the debtor with rental equipment for four years, and the pre-preference period invoices paid to the defendant exceed $86,000.00.  Due to the parties' enduring and steady relationship, the court places greater emphasis on the terms of the parties' prior dealings.  The industry norms, while still somewhat relevant, are less significant as a result.  Advo-System, 37 F.3d at 1050.

### 1. Subjective Analysis

Courts have looked to several factors in analyzing the parties' prior dealings.  See, e.g., In re Day Telecomm., Inc., 70 B.R. 904, 910 (Bankr. E.D.N.C. 1987) (noting the consideration of such factors as "the prior course of dealing between the parties, the amount and timing of the payment, and the circumstances surrounding payment").  The dispute in this case centers solely on the timing of the payments.  The trustee argues that the preference payments were not made consistent with the terms of the parties' prior dealings.  He contends that average time between invoice and payment

8

prior to the debtor's insolvency is fifty-six days, and that many of the preference payments were made far in excess of this average, including some payments which exceeded the average by twenty to thirty days.

The defendant has supplied the court with a spreadsheet detailing, among other figures, the number of days elapsed between invoice and payment for payments both prior to and during the preference period. Affidavit of Lauri M. Fountain, Exhibit A. Based on the court's statistical analysis of these figures, the average time between invoice and payment prior to the preference period is 56.11 days, and the median is 53.5 days. During the preference period, the average time between invoice and payment is 65.08 days, and the median is seventy days.

The remaining question is whether these figures indicate a substantial change to the parties' dealings during the preference period. The court finds that they do not. Although each business relationship is unique, the court's conclusion finds support in G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co.), 439 F.3d 233 (5th Cir. 2006). In that case, the average time between invoice and payment during the pre-preference period was twenty-one days, and the median was seventeen days. During the preference period, the average time between invoice and payment rose to 38.67 days and the median to thirty-seven days. Id. at 239-40. The court analyzed each set of invoices and payments during the preference period by comparing them to the pre-preference period average. Id. at 240. The bankruptcy court ruled, and the Fifth Circuit agreed, that a preference payment that discharged invoices averaging 25.22 days old was made in the ordinary course of business, but that a preference payment that discharged invoices averaging 35.37 days old was not made in the ordinary course of business. Id.

In SGSM Acquisition Co., the preference payment made in the ordinary course of business

9

discharged invoices that exceeded the pre-preference period average by 20.10%, whereas the payment outside of the ordinary course of business exceeded the pre-preference period average by 68.43%. In this case, the average time elapsed between payment and invoice during the preference period (65.08 days) exceeds the pre-preference period average (56.11) by only 15.99%. This figure represents a seemingly insubstantial change in the parties' business dealings, especially given that In re SGSM Acquisition Co. tolerated a greater deviation from prior dealings. Therefore, the court finds that the preference payments were made in the ordinary course of dealings between the debtor and the defendant.

The court recognizes that its approach of comparing the preference period average with the pre-preference period average differs from the Fifth Circuit's approach of comparing each individual preference payment to the pre-preference period average. However, in this case, the court's approach most accurately achieves § 547(c)'s purpose of "leav[ing] undisturbed normal financial relations." Advo-System, 37 F.3d at 1047. The $6,173.91 preference payment, which is the only preference payment that arguably approaches being outside the ordinary course of business (ninety-nine days between invoice and payment, representing a 76.44% increase above the pre-preference period average), was made on June 11, 2004, only ten days into the preference period. It would seem inaccurate to say that this payment is so far beyond what the parties have considered a "normal financial transaction" in past dealings that it "bears the earmark[] of favoritism/and or exploitation" Id. at 1050, to the detriment of other creditors. In addition, that the payment discharged an invoice ninety-nine days old does not render it outside the scope of the parties' prior dealings given that some pre-preference period payments discharged invoices as old as 186 days.

2. Objective Analysis

As noted above, the defendant must also show that the preference payments were made according to ordinary business terms, as judged by industry norms. The defendant offers two affidavits of Lauri M. Fountain, one of its region credit analysts.[6] In her affidavits, Fountain states that: she has worked in the equipment rental business for ten years, including her employment with the defendant since January 1, 1998; she is familiar with the books and records of the business, and that she has access, control, and supervisory responsibilities over these books and records; she is familiar with the defendant's billing, collection, and accounting practices, as well as the payment history between the debtor and the defendant; and that the invoicing system, as well as the terms and actions between the parties, including payment, were consistent with other customers and general business practices in the industry. Affidavit of Lauri M. Fountain at 1-2, Second Affidavit of Lauri M. Fountain at 3-4.

The court accepts that Fountain is competent to establish industry standards of payment terms in the construction equipment rental industry. Although Fountain's experiences that aid her in establishing the industry standards have come exclusively as an employee of the defendant, the court recognizes that the defendant is one of the largest construction equipment rental companies in the country, and that its business dealings with other customers are sufficient to validate Fountain's knowledge regarding industry standards. In crediting the validity of Fountain's

---

[6]The trustee requests that the court strike Fountain's affidavits on the basis that they contain statements unsupported by fact and/or personal knowledge. As discussed below, the court finds that Fountain is competent to testify as to the industry practices relating to payment for construction equipment rental. Therefore, to the extent that the trustee seeks to strike Fountain's statements related to this subject, the court denies the trustee's motion. The court denies the trustee's remaining objections as moot.

11

statements, the court emphasizes that it is placing significantly less weight on this testimony based on the court's conclusion that the parties' prior business dealings are the most significant aid in determining whether the preference payments were made in the ordinary course of business. Notably, the trustee has supplied no contrary evidence to establish that the pattern seen here does not reflect industry standards.

## **CONCLUSION**

Therefore, the court concludes that the preference payments were made in the ordinary course of business since they were consistent with the parties' prior business terms and in line with industry standards. Therefore, the defendant is entitled to summary judgment as to the full amount of the preference payments. The clerk is directed to enter judgment that the plaintiff have and recover nothing of the defendant.

"**END OF DOCUMENT**"